# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>SEAN CLEMON, )<br>)<br>Defendant. )<br>_____ ) | Cause No. 3:21-CR-30003-DWD-4 |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

### INTRODUCTION AND BACKGROUND

The matter comes before the Court on the Defendant's Motion to Reopen February 1, 2021 Detention Hearing. (Doc. 270). The Honorable David W. Dugan referred the matter to the undersigned on February 23, 2022. (Doc. 280). The Court construes the instant motion as a motion to reconsider the magistrate's detention order. A hearing on the motion was held on March 28, 2022. (Doc. 298). The Government presented its evidence in favor of detention by way of proffer. The Court took the matter under advisement. *Id.* Post-hearing, the United States Pre-Trial Office conducted an additional investigation. On April 4, 2022, the Court received a supplement to the original bail report detailing the aforementioned investigation, which recommended detention.

On April 29, 2022, the Court held a status conference with the parties to discuss the Defendant's pending motion for reconsideration. (Doc. 336). In its review of the Defendant's motion, the Court also construed the motion as objecting to the

Government's presentation of evidence by way of proffer. As such, the Court informed the parties that it was setting the matter for another hearing, wherein the Government would be required to present a live witness regarding the strength of the evidence against the Defendant. On June 2, 2022, the reopened detention hearing was held, and the Court heard the testimony of Agent T. Miller of the Bureau of Alcohol, Tobacco and Firearms ("ATF"). (Doc. 365). Based on the evidence presented at the hearing and for the reasons set forth below, the Defendant is ordered detained pending trial.

By way of background, on January 21, 2021, the Defendant was indicted for the following charges:

> **Count 1:**  Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d);
>
> **Count 2:**  Murder in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1);
>
> **Counts 3, 6, 8, and 10:**  Use of a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924 (c)(1)(A);
>
> **Count 4:**  Use of a Firearm During and in Relation to a Crime of Violence Causing Death, in violation of 18 U.S.C. § 924(j)(1); and
>
> **Counts 5, 7 and 9:**  Attempted Murder in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(5).

(Doc. 1). On February 1, 2021, Defendant appeared for a detention hearing. (Doc. 35). A bail report was received which recommended detention. Evidence was presented by way of proffer and arguments of the parties were heard. At the conclusion of the detention hearing, the Court ordered the Defendant detained pending trial. *Id.*

The original detention order concluded that the presumption of detention had been rebutted. (Doc. 36, p. 2). However, after considering the presumption and the other

required factors under 18 U.S.C. § 3142(g), the Court detained the Defendant. *Id.* Specifically, the Court noted that the following factors weighed in favor of detention: (1) the weight of the evidence against the defendant was strong; (2) the defendant was subject to a lengthy period of incarceration if convicted; (3) the defendant's prior criminal history; and (4) the defendant's history of violence or use of weapons. *Id.* As such, the Court concluded that the United States had met its burden of proof by clear and convincing evidence that the Defendant presented a danger to the community and that no condition or combination of conditions could be imposed to alleviate that danger. *Id.* at p. 3.

## Discussion

**A.     Preliminary Matters.**

As an initial matter, the Court must address the statutory requirements for re-opening the detention hearing.  Section 3142 provides as follows:

> The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

18 U.S.C. § 3142(f)(2). In his motion to reopen the detention hearing, the Defendant pointed to the transcript of the prior detention hearing, where the Court stated the following:

> However, as I did in the prior case, obviously the Court or the defendant does not have access to this evidence as it currently stands. If any of these representations made by the United States are called into question by the evidence produced by the United States in discovery to the defendant, then Mr. Schattnik, you are more

> than welcome to ask this Court to reconsider its detention decision and to argue that there is perhaps new evidence that was not presented at the time of the detention hearing.
>
> As the parties are well aware, this Court may revisit a detention decision if new evidence is presented that was not presented at the detention hearing. And, Mr. Schattnik, obviously, if you recover through your discovery and your investigation in this case, some of these – some of these facts as outlined by the United States are not as they seem, then obviously I would entertain such a motion, because obviously the reasoning for the Court's detention is based largely in part on the government's proffer of evidence, and the government's representation to the Court that this evidence – this multitude of evidence is in fact linking Mr. Clemon to this conspiracy . . .

(Doc. 116, p. 30-31). The Court confirmed this in its written detention order when it noted that the detention hearing could be reopened if "new evidence [wa]s discovered and presented." (Doc. 36, p. 3).

In seeking a reopening of the detention hearing, the Defendant noted that the Court's prior detention decision was based in large part on the proffer of the evidence presented by the Government linking the Defendant to the charged crimes. Having reviewed the voluminous discovery produced by the Government to date, the Defendant now appears to question some of the representations made by the Government at the prior detention hearing. The Defendant characterizes the Government's proffer of evidence at the prior hearing as promises made by the Government to the Court of the strength of the Government's case. And, after a review of the discovery, the Defendant now believes that the Government has "underdelivered" on those promises. In light of these allegations, and the Court's prior representation to the Defendant that it could reopen the hearing if new evidence came to light, the Court opted to hold a hearing and treat the matter as a reconsideration of the Magistrate Judge's detention order.

The reopened hearing was held on March 28, 2022 with the Government once again presenting its evidence against the Defendant by way of proffer. (Doc. 298). The proffered evidence mirrored the presentation of the evidence at the original detention hearing. After taking the matter under advisement, the Court believed that the Defendant was also objecting to the presentation of the evidence against him by way of proffer, especially as it related to the strength of the Government's case against him. There is legal support for such an argument as the Bail Reform Act appears to only give the Defendant the ability to proffer evidence before the Court. *See, e.g.*, 18 U.S.C. § 3142(f)(2)(B)(stating that at a detention hearing, the defendant "shall be afforded an opportunity . . . to present information ***by way of proffer*** or otherwise.") (emphasis added). The Bail Reform Act makes no mention of the Government's ability to present evidence by way of proffer. The Seventh Circuit has not spoken to this precise issue, but courts in other jurisdictions have afforded the Government the ability to proceed by way of proffer. *See, e.g.*, *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996)(noting that the First, Second, Ninth and Eleventh Circuits have considered the issue and have permitted the Government to proceed by proffer).

Although the Court does not express an opinion on this issue, the Court finds persuasive the reasoning of the court in *United States v. Russell*, No. 19 CR 641, 2021 WL 5447037 (N.D. Ill. Nov. 22, 2021). The Court in *Russell* addressed the issue of under what circumstances it was appropriate to request a live witness rather than accept a proffer. *Id.* at *5. The Court concluded that requesting a live witness was appropriate when (1) there was no detailed indictment or affidavit describing the facts upon which the detention

order would be based; and (2) where the charged or uncharged conduct would constitute a substantial basis for the Court's decision to find that the Government had met its burden of proof. *Id.* at *6. Here, the first consideration is not satisfied as the Government has filed a lengthy and detailed indictment alleging specific actions and/or knowledge of the Defendant as it relates to the charged offenses. Nevertheless, *Russell* noted that the Court can exercise its discretion to request a live witness in appropriate circumstances. *Id.* Here, the weight of the evidence against the Defendant would be a key factor in determining whether or not the Government had met its required burden of proof. Moreover, the Defendant openly called into question the strength of this evidence in its review of the provided discovery. In light of these circumstances, the Court in its discretion felt that it was appropriate to request a live witness from the Government.

**B.      Presumption of Detention and Weighing of Required Factors.**

The Court is once again tasked with weighing the required factors under 18 U.S.C. § 3142(g) to determine whether the Government has met its required burden of proof. With respect to assuring the safety of any other person and the community and whether any condition or combination of conditions could be imposed to alleviate that concern, the Government bears the burden of proof by clear and convincing evidence. *See United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985). Regarding whether any conditions could be imposed to reasonably assure the appearance of the defendant at future proceedings, the Government bears the burden of proof by a preponderance of the evidence. *Id.* at 765.

The Court first notes that a presumption of detention applies to the instant case because of the nature of the crime charged against the Defendant. "It shall be presumed

that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed . . . an offense under section 924(c), . . . ." *See* 18 U.S.C. § 3142(e)(3)(B). Here, the Grand Jury charged the Defendant in Count 3 with the use of a firearm during and in relation to a crime of violence, which is an offense under section 924(c). *See* 18 U.S.C. § 924(c)(1)(A). The Court concludes that the probable cause element is satisfied through the Grand Jury's finding of probable cause and subsequent issuance of a true bill of indictment against the Defendant. *See United States v. Dominguez*, 783 F.2d 702, 706 n.7 (7th Cir. 1986). *See also United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991)(noting that grand jury indictment provided probable cause for commission of offense which triggered the presumption of detention). As such, the presumption of detention is applicable.

      The aforementioned presumption is rebuttable. *See* 18 U.S.C. § 3142(e)(3). To rebut this presumption, a Defendant must satisfy a "'burden of production' by coming forward with some evidence that he will not flee or endanger the community if released." *Dominguez*, 783 F.2d at 707. The burden of persuasion always remains with the Government, even if the Defendant satisfies this burden of production. *Id.* The burden of production is not a "heavy one" and can consist of evidence relating to "marital, family and employment status, . . . and other types of evidence encompassed in § 3142(g)(3)." *Id.* Here, a supplementary bail investigation revealed a home plan, wherein the Defendant would stay with his wife and five children at an address in Cape Girardeau, Missouri, in the Eastern District of Missouri. The investigation further revealed that the Defendant

worked from September 2018 through January 2021 at Environmental Marine Services. The Defendant's former supervisor additionally indicated that the company would "consider interviewing [the Defendant] for possible re-employment[]" if he were to be released. Based on this evidence, the Court finds that the Defendant has met his burden of production and has successfully rebutted the presumption of detention.

However, even with the presumption rebutted, the presumption does not disappear. Rather, it remains and "weigh[s] in the balance against bail even after the defendant meets his burden of producing some evidence to rebut the presumption." *United States v. Diaz,* 777 F.2d 1236, 1238 (7th Cir. 1985). This is because the presumption is a reflection of Congress's view "that certain offenders . . . as a group are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions." *Dominguez*, 782 F.2d at 707. Accordingly, the existence of the presumption is a factor which weighs squarely in favor of the Defendant's detention.

The Court next turns to the other required factors under the Bail Reform Act. Section 3142(g) requires the Court to examine the following:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including –
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community,

>> community ties, past conduct history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

As to the first factor, the nature and circumstances of the charged offenses are indeed serious and are of a violent nature. The indictment alleges the existence of a RICO conspiracy where the enterprise is a street and prison gang called the Gangster Disciples ("GD"). (Doc. 1, p. 1). The GD started in Chicago, Illinois, in the 1960s, but has since then spread throughout the United States. *Id.* The GD is particularly active in state and federal prison systems. *Id.* at p. 4. The GD is organized around a hierarchical structure of leadership at the national and state levels. *Id.* at p. 2. For example, Board Members are high ranking leaders of the GD at the national level. *Id.* Governors and Assistant Governors are high ranking state level leaders of the organization. *Id.* The Defendant is alleged to have held the role of Governor for the State of Missouri. *Id.* at p. 7.

One of the key purposes of the enterprise is to preserve and protect the GD's power, territory and operations through the use of intimidation and violence. (Doc. 1, p. 5). This is accomplished through the existence of various laws and policies which members are required to follow. One such rule is "[s]ilence and secrecy" [which] is a total prohibition on cooperation with law enforcement, with serious violations punishable by

death." *Id.* at p. 3. At the first detention hearing, the Government referred to this rule as "Rule Number 1." (Doc. 116, p.10). To enforce this rule, the Government noted that the GD would obtain paperwork or legal documentation of various members to determine whether such members or others have cooperated with law enforcement. *Id.* at 10-11. Absolute loyalty is required, and members who have broken the GD's rules are typically punished by being subjected to physical harm. (Doc. 1, p. 4).

As to the Defendant's specific involvement in the GD, the Government alleges that the Defendant relayed an order that resulted in a murder in April of 2018. Specifically, on April 28, 2018, a dispute arose regarding GD leadership in Missouri at a meeting that took place at a public park in Bridgeton, Missouri. (Doc. 1, p. 10). Prior to this meeting, Co-Defendant Warren Griffin, a Board Member, removed D.W. (aka Assassin) from his role as Governor of Missouri in early 2018. *Id.* at p. 9. Co-Defendant Frank Smith, another Board Member, announced in late March 2018 that D.W. was an "enem[y] of the ORG"; Smith further threatened disciplinary action against anyone who associated with D.W. *Id.* at p. 10. The Defendant, D.W., and Co-Defendants Dominque Maxwell and Perry Harris were all present together at a park in Bridgeton, Missouri. *Id.* When a dispute erupted over GD leadership, the Defendant contacted Frank Smith by phone, and Smith instructed his subordinates to shoot D.W. *Id.* Upon receiving that order, the Defendant relayed the instructions to Co-Defendants Maxwell and Harris. *Id.* Maxwell and Harris then shot at D.W. and others, which resulted in the death of Leroy Allen and the wounding of D.W. and M.K. *Id.* The Defendant, as well as Co-Defendants Maxwell and Harris, were later promoted to state leadership positions in Missouri as a reward for their

actions. *Id.* At the evidentiary hearing, ATF Agent Miller testified and confirmed the various aspects of the GD's nature, culture, and history as laid out in the indictment. Agent Miller further confirmed the Defendant's involvement in the charged offenses as set forth in the indictment.

The allegations above clearly establish the serious and violent nature of the offenses charged against the Defendant. The offenses involved the use of firearms, which were discharged in a public park and resulted in the loss of human life and the wounding of others. The seriousness of the offenses is further underscored by the fact that the Defendant, if convicted, faces the maximum criminal penalty that could be imposed, *i.e.*, death or imprisonment for life. *See* 18 U.S.C. § 924(j)(1). This shooting also came about as a result of an ongoing course of conduct that is designed to instill loyalty to and promote the illegal activities of a nationwide and gang-based enterprise known as the GD. The nature and circumstances of the instant offense thus weigh heavily in favor of the Defendant's detention.

The second factor, the weight of the evidence against the Defendant, likewise weighs heavily in favor of the Defendant's detention. At the evidentiary hearing, Agent Miller identified several pieces of evidence linking the Defendant to the Bridgeton park shooting. First and foremost, the Defendant admitted in an interview with police on February 9, 2020, that he was present when the shooting took place. The Defendant did deny that he and the others who were with him were involved in the shooting, but he offered a version of events that was not consistent with the other evidence presented by the Government. For example, the Government noted that over 75 shell casings were

recovered from the scene. The Defendant, however, indicated that none of his guys were armed with firearms. Nevertheless, Co-Defendants Maxwell and Harris were both later found in possession of weapons that were ballistically linked to the Bridgeton scene through the shell casings found there.

Wiretaps of Co-Defendant Maxwell's phone further confirm the Defendant's involvement and culpability in the offense. For example, after the Defendant was interviewed, the Defendant talked to Maxwell to coordinate their stories in several recorded calls. In one of the calls, the Defendant recounts the story he told the police, wherein he told the police that he was under the table with Maxwell. In another call, the Defendant stresses to Maxwell the importance of telling the police that there were no guns and that nothing was seen because they were hiding under the table. In yet another intercepted call, the Defendant again instructs Maxwell to tell the police that he was under the table. He further notes that the police did not mention Co-Defendant Harris, so he instructed Maxwell to keep it that way. Finally, in another call the Defendant instructs Maxwell to contact Co-Defendant Harris and to meet him in person before the police could arrive. Maxwell obliges and there is another recorded call where he calls Co-Defendant Harris.

Recorded phone calls and video surveillance further confirm the Government's narrative of the purpose of the meeting at the Bridgeton park. For example, the Government was able to piece together that D.W. (aka Assassin) had been the governor of Missouri for the GD, but he was removed from power. Board members Smith and Griffin then appointed another individual to replace him. A meeting was held at the

Bridgeton park. The Defendant and his entourage drove up from Cape Girardeau for the meeting. Confirming this was video surveillance showing Co-Defendants Maxwell and Harris at a Shell gas station prior to the meeting at the Bridgeton park.

The events of the shooting and its immediate aftermath were developed from the statements of witnesses, as well as cooperating defendants and informants, who are considered by the Government to be Jencks witnesses. The Government's evidence indicates that at the meeting a dispute arose over D.W.'s place in the organization. The Defendant then makes contact with Board Member Smith through a cell phone so that Smith could weigh in on the dispute. Smith confirmed that D.W. was no longer the Governor of Missouri, but D.W. refused to yield. Smith, who was still on the phone with the Defendant, gave the order to attack D.W. The Defendant then relayed the order to Co-Defendant Maxwell. While D.W. was the intended target, LeRoy Allen died.

A key piece of evidence confirming this sequence of events is the fact that Co-Defendant Maxwell's phone and Smith's phone were connected at the time of the shooting. This was corroborated by phone records and cell phone extractions. After the shooting, Co-Defendant Maxwell messaged Smith indicating that the deed had been done. This was confirmed through the seizure of Smith's phone, wherein a message was found between Smith and Maxwell that said M. Tyson's punch out. According to Agent Miller, Co-Defendant Maxwell had used that same term in a recorded jail call referencing someone else who had fallen out of favor with him. The phrase clearly had a connotation of violence. As a reward, the Defendant was promoted to Governor and Co-Defendant

Maxwell was promoted to Assistant Governor. The leadership roles of the two aforementioned individuals was later corroborated through various jail calls.

It is with the strength of the evidence where the Defendant claims that the Government has under promised and over delivered on the original representations made to the Court at the first detention hearing. For example, the Defendant claimed that the Government originally represented that the Defendant was personally responsible for the death of LeRoy Allen. (Doc. 270, p. 4). But, according to the Defendant's review of the discovery disclosed to date, there was no such evidence of the Defendant being "personally responsible" for the death. However, the Government never represented to the Court that the Defendant pulled the trigger which resulted in the death of LeRoy Allen. Rather, the Government all along has maintained that the Defendant relayed the order to others who actually did the shooting. (Doc. 116, p. 9). Regarding the specific offense, which results in the presumption of detention, *i.e.*, Count 3 – Use of a Firearm During and in Relation to a Crime of Violence, the Defendant is specifically charged with aiding and abetting that offense. (Doc. 1, p. 18). And, an aider and abettor of an offense is liable as if he or she were a principal. *See, e.g.*, 18 U.S.C. § 2 (stating that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, ***is punishable as a principal***.") (emphasis added). Thus, the Government indeed has a basis to claim that the Defendant was personally responsible for the offense, even though he may not have pulled the trigger.

Moreover, the Court has on two separate occasions heard the Government proffer its evidence against the Defendant. (Doc. 35, 298). The Court has likewise heard the live

testimony of an agent who was heavily involved in the investigation of the various offenses against the Defendant. The Court finds that both the proffered evidence and the live testimony under oath regarding said evidence were consistent with each other, and in no way did the Government under promise and/or over deliver on its representations to the Court. The above evidence against the Defendant is indeed strong and weighs squarely in favor of detention.

The third factor, the history and characteristics of the Defendant, presents somewhat of a mixed bag. On the one hand, the Defendant has a viable home plan in Cape Girardeau, Missouri, where he would be residing with his wife and five children. The Defendant also appears to have an opportunity at gainful employment. The Defendant had worked previously with Environmental Marine Services as a production supervisor from September 2018 to January 2021. The Defendant's former employer indicated that it would consider interviewing the Defendant for possible re-employment. It is also noteworthy that the Defendant was gainfully employed for a significant period of time. These facts would appear to weigh in favor of release.

On the other hand, the Defendant's criminal history would appear to counterbalance the above facts to some degree. The Defendant pled guilty to two controlled substance felonies in December 1991 and received 2 years' probation. The Defendant also has a prior federal felony conviction for conspiracy to distribute cocaine for which he received 170 months imprisonment in February 1995. Finally, the Defendant was convicted in September 2012 of driving while intoxicated and endangering the welfare of a child, both misdemeanor offenses, for which he received probation. It should

be noted, however, that the Defendant successfully completed his probation and supervised release terms, apparently without incident. On the whole, the Defendant's history and characteristics admittedly would appear to tilt somewhat in favor of release.

The final factor for the Court to consider is the nature and seriousness of the danger to any person or the community that would be posed by the person's release. This factor also weighs in favor of detention. At the most recent evidentiary hearing, the Government presented clear evidence of the Defendant being involved in various obstructive efforts related to the shooting investigation in Bridgeton. When tied together with the GD's history and culture of suppressing cooperation with law enforcement authorities, the danger presented by the Defendant's release is readily apparent. The Government's ability to link the Defendant to the Bridgeton shooting is based on the testimony of a number of Jencks witnesses, most of whom are known to the Defendant. But, even if the Defendant is released on the most restrictive conditions possible, there is no way the Court can prevent the Defendant or others acting on his behalf from contacting these witnesses. And, given the Defendant's previous obstructive efforts and the GD's past history, the Court has no confidence that the Defendant would abide by a no contact rule.

In the final analysis, while the history and characteristics of the Defendant do weigh somewhat in favor of release, the other factors weigh decisively in favor of detention. More importantly, given the Defendant's past obstructive efforts and the GD's penchant for such activities, the Court does not believe that there are any conditions or combination of conditions which could be imposed to alleviate the danger posed by the

Defendant's release. As such, the Court finds that the Government has met its required burden of proof and detention is thus warranted.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Reopen February 1, 2021 Detention Hearing (Doc. 270), which the Court construes as a motion to reconsider the magistrate's detention order, is **DENIED**. The Defendant shall remain detained in the custody of the United States Marshal pending the final outcome in this matter.

**IT IS SO ORDERED.**

**DATED:  July 14, 2022.**

Digitally signed by Judge Sison 2
Date: 2022.07.14
11:55:33 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**