IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 21-CR-30003-DWD |
| ) | |
| SEAN CLEMON, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM AND ORDER

Defendant Sean Clemon ("Clemon") has filed a motion for judgment of acquittal, *see* FED. R. CRIM. P. 29, or alternatively for a new trial, *see* FED. R. CRIM. P. 33 ("Motion"). The Government did not respond to the Motion. For the reasons explained below and at trial,[1] the Motion is denied.

### I.   Background

**A. Superseding Indictment**

On December 13, 2022, the grand jury returned a thirteen-count superseding indictment against five alleged members of the Gangster Disciples street and prison gang. (Doc. 671).[2] Count One of the superseding indictment charged Frank Smith, Warren Griffin, Anthony Dobbins, Sean Clemon, and Dominique Maxwell with conspiring to

---

[1] Sean Clemon made an oral motion for judgment of acquittal at the close of the Government's case. The motion was denied. (Doc. 920, pp. 97-105).
[2] The original indictment was returned on January 20, 2021. It included thirteen counts directed against Frank Smith, Warren Griffin, Anthony Dobbins, Sean Clemon, Dominique Maxwell, Perry Harris, and Barry Boyce. (Doc. 1). Defendants Dobbins, Harris, and Boyce pleaded guilty prior to trial.

violate the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et. seq.*, through their alleged involvement with the Gangster Disciples, in violation of 18 U.S.C. § 1962(d) and 1963(a). The indictment also charged the Defendants with numerous violent crimes and firearms offenses in connection with the racketeering conspiracy.

As is relevant to the instant motion, the indictment charged Clemon, as well as co-defendants Frank Smith ("Smith") and Dominique Maxwell ("Maxwell") with the following violent crimes and firearms offenses, all of which stemmed from a shooting involving rival factions of the Gangster Disciples at Matthew's Park in Bridgeton, Missouri ("Matthew's Park shooting"): Count Two, murder in aid of racketeering, namely the murder of Leroy Allen, *see* 18 U.S.C. § 1959(a)(1) and Section 2; Count Three, use of a firearm during and in relation to a crime of violence, namely the murder of Leroy Allen, *see* 18 U.S.C. §924(c)(1)(A) and Section 2; Count Four, use of a firearm during and in relation to a crime of violence causing death, namely the murder of Leroy Allen, *see* 18 U.S.C. § 924(j)(1) and Section 2; Count Five, attempted murder in aid of racketeering, namely the attempted murder of Dushawn Wharton, *see* 18 U.S.C. § 1959(a)(5) and Section 2; and Count Six, use of a firearm during and in relation to a crime of violence, namely the attempted murder of Dushawn Wharton, *see* 18 U.S.C. 924(c)(1)(A) and Section 2.[3]

---

[3] Counts Seven through Ten of the superseding indictment were also directed against Smith, Maxwell, and Clemon. These charges, however, were dismissed by the Government. Counts Eleven through Thirteen of the superseding indictment were directed against Warren Griffin and Anthony Dobbins. These counts are not relevant to the instant motion and will not be further addressed.

### B. Jury Trial

A jury trial commenced on January 23, 2023 and culminated on March 6, 2023. Clemon was found guilty on all charges (Counts One through Six). The following is a summary of facts adduced at trial relevant to Clemon's motion, presented in a light most favorable to the government. *United States v. Wrobel*, 841 F.3d 450, 454 (7th Cir. 2016).[4]

### 1. The Gangster Disciples as a Criminal Organization

Over the course of 23 days, the jury heard a great deal of evidence about the Gangster Disciples on a national and regional level. The jury, by virtue of the guilty verdicts on Count One, found the Gangster Disciples to be a criminal organization for purposes of RICO. They further found Clemon and his co-defendants guilty of knowingly joining the Gangster Disciples and participating in its affairs through a pattern of racketeering activity that included acts involving drug trafficking, murder, attempted murder, conspiracy to commit murder, and witness tampering.[5]

Evidence presented at trial established that the Gangster Disciples was formed in the late 1960s after two Chicago street gangs merged. The gang is governed by a national board of directors and by its founder, Larry Hoover, who is known as the chairman of

---

[4] The Court will not catalog all the evidence presented over the course of the trial; rather, evidence is discussed as relevant to and only in the detail required to address arguments raised by Clemon. Further, Clemon does not challenge his conviction on the RICO count. For that reason, the Court's discussion of the background, history, and operation of the Gangster Disciples is brief.

[5] Evidence presented at trial was sufficient for the jury to conclude that Clemon personally committed acts involving murder, attempted murder, and witness tampering.

the Gangster Disciples. Despite being incarcerated at ADX-Florence, Colorado, the federal supermax prison, Larry Hoover continues to direct and influence the gang's activities and leadership structure.

The Gangster Disciples has a top-down organizational structure, with specific leadership positions, known as "positions of authority." As is relevant to the instant motion, the gang's positions of authority include: (1) Chairman, the national leader of the Gangster Disciples (Larry Hoover); (2) Board Members, the highest-ranking national leaders beneath the Chairman; (3) Governors of Governors or Attorneys General, leaders over multi-state regions of the United States; (4) Governors or Superintendents, the highest-ranking state-level leaders; and (5) Assistant Governors or Assistant Superintendents, the second-in-command of their respective states. Various members were also responsible for providing security for the organization and its members and leaders.

Within the Gangster Disciples, positions of authority were extremely important. Gang members were expected to respect the hierarchy, follow the chain of command, and maintain silence and secrecy.[6] There were numerous leadership disputes within the gang. These disputes often resulted in violent conflicts between various factions, such as the shooting at Matthew's Park.

Defendants Smith, Griffin, Maxwell, and Clemon were aligned and held positions of authority in the Gangster Disciples. Smith and Griffin were board members, meaning

---

[6] Evidence presented at trial established that "silence and secrecy" is one of the gang's rules – members were prohibited from sharing any information about the Gangster Disciples with non-members.

4

they had authority over Gangster Disciples' members throughout the United States. Initially, Clemon and Maxwell held leadership positions over the Gangster Disciples in Cape Girardeau, Missouri, with Clemon being Maxwell's superior. After the shooting in Matthew's Park, however, Clemon and Maxwell were promoted. Clemon became the Governor of Missouri, and Maxwell became the Assistant Governor.

**2. Matthew's Park Shooting**

Evidence produced at trial established that, as early as January 2017, there were disputes regarding positions of authority in Missouri. At the time, Deshawn Wharton was the Governor of Missouri with LeRoy Allen supporting him in a security roll. But Gangster Disciples' board members Smith and Griffin wanted Wharton removed from his position of authority – a fact known to both Maxwell and Clemon. In 2017, Griffin began discussing his plans to assassinate Wharton. And in early 2018, Smith sent a message to Gangster Disciples members indicating that, among others, Wharton was officially "off count" and should be treated as an enemy of the organization.

In March 2018, Griffin held a meeting at Starbucks with various members of the Gangster Disciples, including Maxwell and Clemon. The purpose of the meeting was to discuss Wharton's removal as the governor of Missouri. During the meeting, Griffin decided Christopher Blount ("Blount"), a fellow Gangster Disciples member, would be temporarily appointed as the governor of Missouri.

Thereafter, Blount messaged certain Gangster Disciples in the region directing them to attend a mandatory meeting on April 28, 2018. Invitees were not told that the meeting would be at Matthew's Park. Instead, they were directed to meet at a gas station

5

near the park. This was done to enhance security and to ensure that invitees could locate the park, which was somewhat secluded. Blount enlisted certain gang members to purchase ammunition ahead of the meeting and to provide security during the meeting. Blount personally took three guns to the meeting, including an semi-automatic rifle.

On April 28, 2018, Gangster Disciples members began arriving at Matthew's Park. Blount had enlisted a member of the security team to search attendees using a metal detecting wand. This was done to prevent any attendees who were associated with Wharton from bringing a gun to the meeting. Other attendees, however, were allowed to bring guns.

Clemon and Maxwell, as well as two other Gangster Disciples members (Deandre Jenkins ("Jenkins") and co-Defendant Perry Harris ("Harris")) drove to Matthew's Park in the same vehicle. Clemon was the highest-ranking member in the group, and everyone understood that they were responsible for ensuring Clemon's safety. They arrived at the park around noon. Approximately twenty to forty other Gangster Disciples were present. After arriving at the park, Clemon briefly spoke with Blount regarding various positions of authority in Missouri. Clemon told Blount he wanted to replace anyone associated with Wharton. Blount did not think this was necessary, but Clemon insisted.

Shortly thereafter, a group of Gangster Disciples that included Wharton and Allen arrived at the park. Wharton approached Clemon and began arguing with him regarding who was the rightful governor of Missouri. Maxwell joined in the argument, telling Wharton he was no longer the governor. He also said that Clemon was now the governor of Missouri. As the argument continued, Maxwell asked Clemon if they should call

Smith, which they proceeded to do. Smith was placed on speaker phone, and as Clemon held the phone, Smith gave the order for a "Mike Tyson punchout." Smith also sent a text to this effect to Maxwell's phone. Within the Gangster Disciples, it was understood that an order for a "Mike Tyson punchout" was a directive for extreme violence such as stabbing or shooting.

After hearing Smith's order, Allen said he was not "feeling" this. Wharton, Allen, and their associates attempted to leave the park, but individuals aligned with Clemon and Maxwell continued to verbally confront them. Allen said they would return when everyone calmed down and turned to leave a second time. As Allen and Wharton were walking away, Maxwell ran up behind Wharton and punched him in the back of the head. At that point, individuals on both sides of the dispute, including Clemon and Maxwell, pulled their guns out and began shouting. Wharton nodded to an individual in his group, Gary Johnson ("Johnson"). Johnson took cover behind a tree and began firing at Harris. At that time, individuals on both sides of the dispute began shooting. More than 70 shots were fired. Allen was killed, and Wharton, who was wearing a bullet proof vest, was seriously wounded, as a result of the gunfire.

Witness testimony and ballistic evidence indicated that Leroy Allen was shot while he was running from the scene and that the fatal bullet came from Maxwell's gun. There was no evidence that Allen was armed during the confrontation. Testimony from Harris established that, after the shooting, Maxwell told Harris and others that he had to "permanently" put someone "to sleep." Clemon told Harris that he fired on Wharton and observed bullets from his gun bouncing off Wharton's bullet proof vest. Clemon said that

7

his gun was "a piece of shit" and that if he had known things were going to go down the way they did, he would have shot Wharton in the head.

Approximately one hour after the shootout, a text message was sent from Maxwell's cellular phone to Smith's cellular phone that said, "done." Smith then instructed Maxwell to contact Griffin. After the shooting, Clemon was promoted to the position of governor of Missouri, and Maxwell was promoted to the position of assistant governor of Missouri.

Clemon was questioned by police approximately two years after the shooting. During the questioning, Clemon claimed that he barely knew Maxwell and denied driving to the park with Maxwell, Harris, and Jenkins. He also told law enforcement that, during the shootout, he was hiding under a picnic table, attempting to protect children from the gunfire. After his interview with police, Clemon called Maxwell and instructed him to lie to police.

### 3. Witness Tampering as to Perry Harris

Clemon testified that, after the Matthew's Park shooting, he attempted to leave the Gangster Disciples. However, Maxwell and Clemon told him he could not leave the gang because he knew too much. Clemon also told him, on three occasions, that he would kill him if he tried to leave the gang. Harris further testified that, at various points, Clemon gave Harris and Maxwell directives regarding disposing of guns used during the Matthew's Park shooting. He also told Harris to lie to police about his involvement in the Matthew's Park shooting. He directed him to say that, during the shootout, he was hiding under a picnic table protecting children.

8

## II. Applicable Legal Standards

### A. Judgment of Acquittal - Rule 29(c)

A defendant in a criminal case who has been found guilty by a jury may move for a judgment of acquittal under Rule 29(c). Fed. R. Crim. P. 29(c). The Court will only overturn the jury's verdict if "after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Wrobel*, 841 F.3d 450, 454 (7th Cir. 2016) (citation omitted); s*ee also United States v. Colonia,* 870 F.2d 1319, 1326 (7th Cir. 1989) (Evidence is sufficient if "*any* rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt, viewing the evidence and every reasonable inference in the light most favoring the prosecution.")(emphasis added); *United States v. Bruun,* 809 F.2d 397, 408 (7th Cir. 1987) (a jury verdict may be overturned only "where the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.")(citations omitted).

The Seventh Circuit has stated that "[a] defendant who challenges the sufficiency of the evidence faces a nearly insurmountable hurdle. . . [in that] [the Court] consider[s] the evidence in the light most favorable to the Government, defer[s] to the credibility determination of the jury, and overturn[s] a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Gougis*, 432 F.3d 735, 743-44 (7th Cir. 2005) (internal quotations omitted).

B.      New Trial - Rule 33

Federal Rule of Criminal Procedure 33 allows "a district court to grant a timely request for a new trial 'if the interest of justice so requires.'" *United States v. O'Malley*, 833 F.3d 810, 811 (7th Cir. 2016) (quoting Fed. R. Crim. P. 33(a)). The Seventh Circuit has cautioned that Rule 33 motions should be granted only in "the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (internal quotation marks omitted); *see also United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (explaining that jury verdicts in criminal cases are "not to be overturned lightly").

I.     Discussion

A. Motion for Judgment of Acquittal

The bulk of Clemon's motion pertains to the shooting at Matthew's Park. Clemon contends that he is entitled to a judgment of acquittal as to the charges pertaining to Dushawn Wharton because (1) evidence established that Wharton was the aggressor and that Clemon was acting in self-defense; (2) Clemon and others in his group did not know that Wharton would be at Matthew's Park, therefore the shooting was not a planned event; (3) there was no evidence establishing that Clemon wanted to be the governor of Missouri; and (4) there is no evidence that Clemon "urged, ordered or in any way even knew that Maxwell was going to start firing." (Doc. 947, pp. 2-3). Although not entirely clear, Clemon may also be arguing that he is entitled to a judgment of acquittal as to the charges pertaining to Leroy Allen because he did not direct Maxwell to start shooting. Finally, Clemon raises an argument as to witness retaliation, stating: "Clemon did not threaten Perry Harris with regard to being a witness in general, or with regard to the

10

content of any testimony provided by him in this case." (Doc. 947, p. 4). The Court addresses each argument in turn below.

### 1. Attempted Murder in Aid of Racketeering – Dushawn Wharton

Count Five alleged that Clemon, Maxwell, and Smith attempted to murder Dushawn Wharton for the purpose of maintaining or increasing their position in the Gangster Disciples, in violation of 18 U.S.C. § 1959(a). Clemon does not dispute that the Gangster Disciples was an enterprise engaged in racketeering activity. Instead, he appears to be arguing that there was insufficient evidence for the jury to conclude that he attempted to murder Wharton or that he had the requisite motive.

Trial testimony established that, after the shootout at Matthew's Park, Clemon told Harris he fired at Wharton, and he saw bullets from his gun bouncing off Wharton's bullet proof vest. He also said that he would have shot Wharton in the head if he had known what was going to happen. This was more than enough evidence for a rational jury to find that Clemon attempted to murder Wharton.

The next question is whether there was sufficient evidence for the jury to find that Clemon acted for the purpose of maintaining or increasing his position in the Gangster Disciples. As to Count Five, the motive requirement is met "if the jury could properly infer that 'the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'" *United States v. DeSilva*, 505 F.3d 711, 715 (7th Cir. 2007) (quoting *United States v. Carson*, 455 F.3d 336, 369 (D.C. Cir. 2006)). There was sufficient evidence to meet that standard here.

11

Evidence presented at trial detailed the hierarchical structure of the Gangster Disciples; members were required to follow orders of higher-ranking members and were expected to respond to any threats to their authority. Evidence further established that Smith and Griffin, both of whom outranked Clemon, wanted Wharton removed as the governor of Missouri – Griffin discussed a desire to assassinate Wharton, and Smith took steps to notify gang members that Wharton was officially "off count" and was no longer the governor of Missouri. Thereafter, Griffin held a meeting, attended by Clemon and others, for the purpose of discussing Wharton's removal as the governor of Missouri and the plan to replace him with Blount.

When Wharton and Allen arrived at Matthew's Park, they confronted Maxwell and Clemon. They insisted that, despite any directives from Griffin or Smith, Wharton was still the governor of Missouri. Given the evidence presented at trial, any reasonable juror could have concluded that Clemon would view these actions as a direct threat to his superiors and to the Gangster Disciples as a whole. For the same reasons, any reasonable juror could have found that, given his position in the Gangster Disciples, Clemon was expected to respond to that threat to maintain and/or advance his position in the gang. Moreover, evidence produced at trial established that Clemon heard Smith issue the order for a "Mike Tyson punchout." Once again, given the evidence presented at trial, the jury could have concluded that Clemon was expected to follow that order to maintain or increase his position in the organization.

Additional arguments raised by Clemon, including that (1) Clemon had no interest in becoming the Governor of Missouri; (2) Clemon did not direct Maxwell to hit Wharton

or start shooting;[7] and (3) Clemon did not know that Wharton would be at Matthew's Park do not alter the Court's analysis. The only question before the court is whether, considering the evidence in a light most favorable to the Government, a rational trier of fact could have found beyond a reasonable doubt that Clemon attempted to murder Wharton to maintain or increase his position in the gang. Even assuming these additional arguments include accurate factual statements, given the evidence discussed above, the jury had sufficient grounds to find beyond a reasonable doubt that Clemon attempted to murder Wharton to maintain or increase his position in the Gangster Disciples.[8]

### 2. Murder in Aid of Racketeering – Leroy Allen

Clemon argues that "[i]n terms of any shooting [by Maxwell] "there is no evidence that Clemon directed, urged, ordered or in any way even knew that Maxwell was going to start firing." For the most part, this contention is raised in connection with the shooting of Wharton, which the Court addressed above. Clemon, however, briefly references Allen in connection with this argument. To the extent that Clemon is attempting to raise an argument as to Count Two (Murder in Aid of Racketeering as to Leroy Allen), the

---

[7] Clemon briefly notes that "in the charging documents" the Government indicated that the "shooting done by co-defendant Maxwell against Wharton and decedent Leroy Allen was at the direction of Clemon." He then goes on to argue that there was no proof that he ordered or directed Maxwell to begin shooting at Matthew's Park. To the extent that Clemon is suggesting he is entitled to a judgment of acquittal because there was variance between the indictment and the proof at trial, the argument is undeveloped, and the Court considers it waived. *See United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) (finding the argument was "decidedly underdeveloped and therefore waived"); *United States v. Foster*, 652 F.3d 776, 793 (7th Cir. 2011) ("As we have said numerous times, underdeveloped arguments are deemed waived[.]") (internal quotation marks omitted).

[8] Because the evidence was sufficient to establish that Clemon committed attempted murder in order to maintain or increase his position in the Gangster Disciples and because Clemon does not raise a separate basis for challenging his related firearm conviction in Count Six, the Court will not address the related firearm conviction.

argument is perfunctory and therefore waived. *See, e.g.*, United States v. Hassebrock, 663 F.3d 906, 914 (7th Cir. 2011). Nonetheless, as is explained more fully below, the fact that Clemon did not personally direct Maxwell's actions would not warrant entry of a judgment of acquittal as to Count Five.

To convict Clemon on Count Five, it was not legally necessary for the jury to find that Clemon gave the order prompting Maxwell to act. The Government presented sufficient evidence for the jury to find that Clemon, Maxwell, Harris, Smith, Griffin, and others were members of a conspiracy to remove Wharton, and anyone aligned with Wharton, from positions of authority at any cost. Given the evidence surrounding the conspiracy to remove Wharton and his followers from their positions of authority, it follows that Clemon could be held criminally liable for the reasonably foreseeable acts committed by his co-conspirators in furtherance of that conspiracy. Pinkerton v. United States, 328 U.S. 640, 647–48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); United States v. Doyle, 121 F.3d 1078, 1091 (7th Cir. 1997). And given the evidence pertaining to the Gangster Disciples as an organization, including the importance of following orders from superiors and the gang's history of using violence to punish those who step out of line, Smith's response to Wharton and Allen challenging his authority, and the steps Maxwell took to carry out Smith's directive for a "Mike Tyson punchout" were reasonably foreseeable.

The evidence presented at trial was also sufficient for the jury to find that Smith was liable as an aider and abettor in the murder of Allen. *See* 18 U.S.C. § 2. To obtain a conviction under a theory of aiding and abetting, the Government had to prove that Clemon "knowingly participated in the transaction as something he wished to bring

14

about and that he sought by his actions to make it succeed." *United States v. Coleman*, 179 F.3d 1056, 1061 (7th Cir. 1999). When Wharton and Allen confronted Maxwell and Clemon at Matthew's Park, Maxwell asked Clemon if they should call Smith. Maxwell did that because Clemon outranked him; Maxwell had to go through Clemon to receive any directives from Smith. When Smith relayed the order for a "Mike Tyson punchout," it was Clemon who was holding the phone to ensure that everyone would hear Smith's order. And when Clemon heard the order for a "Mike Tyson punchout," he knew exactly what that meant and what he and Maxwell were expected to do to maintain or increase their position in the Gangster Disciples. Considering this evidence, and Clemon's participation in the firefight that ensued, a reasonable jury could have found Clemon liable as an aider and abettor in the murder of Allen.[9]

### 3. Self Defense

Clemon contends that he is entitled to a judgment of acquittal as to charges stemming from the Matthew's Park shooting because he was acting in self-defense. Clemon argues that Johnson, in response to a gesture from Wharton, was the first to fire. While the evidence did show that Johnson, who was firing at Harris, was the first to fire, this argument does not entitle Clemon to a judgment of acquittal.

First, Clemon presented a self-defense argument to the jury and the jury received a jury instruction on self-defense under Missouri law. The jury, however, rejected Clemon's argument. In considering a motion for a judgment of acquittal, it is not the

---

[9] Once again, because the evidence was sufficient to sustain a conviction as to Count Two, and because Clemon does not raise a separate basis for challenging his related firearm convictions in Count Three and Four, the Court will not address the related firearm convictions.

15

Court's role to reweigh evidence. *United States v. Armbruster*, 48 F.4th 527, 535 (7th Cir. 2022). Second, under Missouri law, a defendant cannot successfully claim self-defense if he was the initial aggressor. *State v. Pool,* No. ED 110620, 2023 WL 4188666, at *7 (Mo. Ct. App. June 27, 2023). *See also id.* (A defendant cannot successfully claim self-defense when using physical force to defend against an attack he provoked); MAI-CR 4th 406 .06 (same). In the instant case, there was sufficient evidence for the jury to conclude that Smith, Clemon, Maxwell, and their co-conspirators were the initial aggressors. Witness testimony established that when Smith gave the order for a "Mike Tyson punchout," Wharton and Allen attempted to leave. As Wharton and Allen were walking away from the confrontation, Maxwell punched Wharton in the back of the head. At that point, individuals from both groups drew their guns, and Johnson began firing at Harris. There was no evidence that Allen was armed or that he fired shots at anyone. Moreover, ballistics and crime-scene evidence, viewed in a light most favorable to the Government, established that Allen was shot and killed as he was running away. After the shooting, Maxwell responded to Smith's "Mike Tyson punchout" text saying simply, "done." This response is not indicative of self-defense. Rather, it supports the contention that, in attacking Wharton and shooting Allen, Maxwell did exactly as he was told. Considering the above, the jury had a sufficient basis for finding that Clemon and his co-conspirators were not acting in self-defense.

### 4. Racketeering Activity, Witness Retaliation – Perry Harris

Clemon states that, "with regard to witness retaliation, [he] did not threaten Perry Harris with regard to being a witness in general or with regard to the content of any

16

testimony provided by him in this case." (Doc. 947, p. 4). Clemon does not expand on this statement in any way.[10] Although not entirely clear, it appears Clemon is arguing that there was insufficient evidence for the jury to find that Clemon engaged in witness *retaliation*; a claim that would be relevant to his conviction as to Count One. But even assuming that is true, it would not entitle Clemon to a judgment of acquittal. Evidence of witness retaliation by Clemon was not necessary to prove the existence of an enterprise or a pattern of racketeering activity. The jury had ample evidence of other racketeering activities that would support a guilty verdict as to Count One. For example, as to racketeering activity committed by Clemon personally, there was sufficient evidence for the jury to find that Clemon engaged in witness *tampering* as to Maxwell and Harris, *see* 18 U.S.C. § 1512, as well as acts involving murder and attempted murder. Further, there was ample evidence for the jury to find that Clemon and his co-conspirators agreed to the commission of other predicate acts. This was more than enough to support Clemon's conviction under § 1962(d).[11]

---

[10] As with some of the other arguments raised by Clemon, this argument is undeveloped and likely waived. Nonetheless, the Court will briefly address it.

[11] Section 1962(d)'s target is the *agreement* to violate the RICO statute's substantive provisions as opposed to the actual violations themselves. *See Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 731 (7th Cir. 1998) (quoting *Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344, 348 (7th Cir. 1992)); *accord U.S. v. Tello*, 687 F.3d 785, 792 (7th Cir. 2012) (stating Section 1962(d) "punishes the agreement to commit such an offense"). That is, such a charge does not require proof that the defendant actually committed two predicate acts of racketeering. *See Tello*, 687 F.3d at 792 (citing *Salinas v. U.S.*, 522 U.S. 52, 65-66 (1997)). Indeed, the acts need not be committed at all. *See id.* Further, an individual may be charged "even if he does not *agree to commit personally* the two predicate acts." *See Goren*, 156 F.3d at 731 (citing *U.S. v. Neapolitan*, 791 F.2d 489, 498 (7th 1986) (Emphasis added)). Finally, an individual need not agree two or more *specific* acts will be committed. *See U.S. v. Briseno*, 843 F.3d 264, 274-75 (7th Cir. 2016) ("[A]greeing that members of a gang will engage in extortion in a certain general area, during a certain time frame, and of a certain scope constitutes a general agreement to act, despite a lack of knowledge or agreement as to the precise dates, locations, and individuals that the extortion will involve.")."

17

B.     **Motion for a New Trial**

During *voir dire* of a panel of prospective jurors, venire member No. 74, responding to standard *voir dire* questions, stated, "This organization, GDs, I've had two or three hits put out on me." (Doc. 901, p. 80). Venire member No. 74 did not make any additional statements. The Court immediately stopped questioning venire member No. 74, proceeded with questioning other venire members, and later dismissed venire member No. 74. On a recess, outside the presence of the jury, Defendants moved to dismiss the panel of venire members that overheard the statement. The Court denied the motion, and when the remaining venire members returned, the Court questioned them about their ability to remain impartial despite venire member No. 74's comment. All remaining members of the venire panel affirmed their ability to remain impartial if selected to serve on the jury.

Clemon now moves for a new trial, contending that the jury was tainted by venire member No. 74's comment. Clemon's argument on this point unspecific and does not cite to any legal authority. Further, Clemon does not identify any evidence suggesting that the jurors who ultimately sat on the jury were actually biased; his argument is purely speculative. Clemon's speculation does not warrant a new trial under the standards of Rule 33. When questioned by the Court, the remaining potential jurors indicated that they could remain impartial despite venire member No. 74's comment, and Clemon gives the Court no reason to discredit those responses. As such, the Court finds no evidence of bias and will deny Clemon's motion for a new trial on that basis. *See*

*United States v. Hernandez*, 84 F.3d 931, 936 (7th Cir. 1996) (not abuse of discretion to refuse to dismiss panel when none of the potential jurors indicated that their impartiality was affected by any statements made during the *voir dire* process); *United States v. Moutry*, 46 F.3d 598, 603 (7th Cir. 1995) ("Absent any reasons [beyond speculation] to suspect as untrue the juror's claims of ability to remain impartial despite exposure to improper … comment, the court should credit those responses.").

### CONCLUSION

For the reasons set forth herein, Defendant Sean Clemon's Motion for Judgment of Acquittal or Alternatively for a New Trial (Doc. 947) is **DENIED**.

**IT IS SO ORDERED.**

Dated: July 17, 2023

DAVID W. DUGAN
United States District Judge